# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| DANIEL HUX, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13-CV-0912-B |
| | § | |
| SMU POLICE CHIEF RICHARD A. | § | |
| SHAFER, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment (doc. 62) filed by Defendant Southern Methodist University Police Chief Richard A. Shafer on March 20, 2015. For the reasons set forth below, Defendant's Motion is **GRANTED**.

## I.

## BACKGROUND[1]

This case arises from the events culminating in a student's mandatory withdrawal from Southern Methodist University ("SMU") due to his behavior on campus. Remaining in this lawsuit are claims for illegal search and seizure and defamation under 42 U.S.C. § 1983, asserted by the student, Plaintiff Daniel Hux ("Hux"), against Defendant SMU Chief of Police Richard Shafer ("Chief Shafer").

### A.    *Factual Background*

During all times relevant to this lawsuit, Hux was an undergraduate student at SMU, where

---

[1] The Court draws its factual account from the parties' pleadings, summary judgment briefs, and evidentiary submissions. Unless characterized as a contention by one of the parties, these facts are undisputed.

he was also hired as a Community Assistant ("CA"), or residential advisor, for the 2010-2011 academic year. Doc. 64, Def.'s App. in Support of Mot. for Summ. J., Tab D, Patmythes Depo. 24:10–16. In January 2011, Stephanie Howeth, a Residential Community Director[2] at SMU, met with Hux to discuss several comments Hux had made to her over the preceding months, which Howeth perceived—incorrectly, according to Hux—to be romantic overtures. Def.'s Tab C, Howeth Depo. 35:20–36:5; 39:19–40:18; 46:24–55:24. Hux's reaction to Howeth's comments during this meeting surprised her and made her feel uncomfortable, as Hux appeared to deflect responsibility for his prior actions. *Id.* at 39:19–40:18.

Subsequently, Dorothea Mack, Hux's supervisor, met with Hux to discuss his interaction with Howeth. Def.'s Tab J, Estes Decl., Ex. 1 – Meeting Between Hux and Mack, App. 160. Due to his behavior toward Howeth, his unwillingness to discuss these matters and understand their effect on others, and additional work performance issues, Mack declined to recommend Hux for reappointment to his CA position for the following year. *Id.* However, Hux was later informed by Adrienne Patmythes, Assistant Director of Resident Life, that despite the reappointment decision, Hux might be able to interview for reappointment later in the semester. Def.'s Tab N, Audio Recordings, AR 20110114 161127.m4a, 14:20; 24:10–25:50.[3]

On January 31, 2011, Howeth sent a mail merged email to all SMU students, encouraging

---

[2] Residential Community Directors are full-time SMU staff members who live on campus and supervise CAs. Def.'s Tab C, Howeth Depo. 13:11–22. Although Howeth was not Hux's supervisor, she was on the same level as his supervisor. *Id.* at 51:3–6.

[3] Hux recorded many of his interactions with SMU personnel that are relevant to this lawsuit. He produced these recordings in discovery and authenticated them in his deposition. Def.'s Tab A, Hux Depo. 44:10–18.

them to apply for SMU's leadership certificate program. Def.'s Tab C, Howeth Depo. 29:19–30:16; Howeth Depo. Ex. – Howeth Email and Hux Response, App. 81–83. Hux—apparently interpreting this email as being solely directed at him—sent the following email response to Howeth: "I guess it was unclear to you, that I do not want you to communicate with me by telephone, in writing, in person, or by electronic communication that I feel harass, alarms, offends, or annoys me." *Id.* at App. 82. The email added that Hux had spoken to Howeth's supervisor about her communicating with him. *Id.*

Howeth felt threatened by the tone of Hux's email and informed Patmythes that she perceived it as "inappropriate and unprofessional." *Id.* at App. 81; Def.'s Tab C, Howeth Depo. 35:10–14; 74:7–16. As a result, Patmythes met with Hux again on February 3, 2011 to discuss this correspondence. Def.'s Tab N, Audio Recordings, AR 20110203 130313.m4a, at 00:46–1:17. She attempted to explain to Hux that his email was condescending, inappropriate, and unprofessional. *Id.* at 1:17–3:18. Hux, however, responded that he did not perceive the email to be inappropriate. *Id.* at 2:20–13:30.

Following this encounter with Patmythes, an additional incident occurred in which Hux confronted another CA about her responsibilities in her residence hall. Def.'s Tab J, Estes Decl., Ex. 2 – Incident Report, App. 161. The CA in question felt uncomfortable as a result of this exchange and consequently reported the incident to the Department of Resident Life and Student Housing. *Id.*

Based on these events, Mack terminated Hux's employment as a CA effective February 10, 2011 for "inappropriate behavior, demonstrating behavior that impairs staff's ability to be a role model . . . and disrespectful or insubordinate behavior." Def.'s Tab J, Estes Decl., Ex. 4 –

Termination Letter, App. 165–66. Mack cited Hux's comments to Howeth, his reaction to Howeth's attempt to discuss his behavior, and his conduct toward his fellow CA as specific examples of behavior warranting his termination. *Id.*

Hux appealed his termination in writing to Steve Logan, Executive Director of Resident Life and Student Housing. Def.'s Tab J, Estes Decl., Ex. 5 – Hux Appeal, App. 167–68. After reviewing this written appeal and meeting with Hux in person, Logan denied Hux's request in a letter dated February 21, 2011. Def.'s Tab J, Estes Decl., Ex. 6 – Letter from Logan Denying Hux's Appeal, App. 169. In this letter, Logan informed Hux that he "should refrain from contacting anyone involved with this situation and stay away from Hawk, Martin, Moore, and the Service House residential communities." *Id.* As Logan was out of town at the time, Chief Shafer delivered this letter to Hux. Def.'s Tab N, Audio Recordings, AR 20110221 160621.m4a, 2:34–2:38. After reading the letter, Hux requested that Chief Shafer clarify whether he could go to the Service House. *Id.* at 6:14. Chief Shafer informed Hux that he could not go to the Service House, as recorded in the following exchange:

> Hux: What does it mean when it says, "you should refrain from contacting and stay away from Hawk, Martin, Moore, and Service House residential communities"?
>
> Chief Shafer: It means they don't want you to go there.
>
> Hux: Even if people invite me over?
>
> Chief Shafer: No. Even if people invite you over. He's telling you not to go there. You should meet them somewhere else.

*Id.* at 6:14–6:42.

Sometime after that, in an incident apparently unrelated to the issues concerning Hux's

employment as a CA and his disagreements with Resident Life and Student Housing staff, Hux arrived at a private lunch event on campus where former First Lady Laura Bush was speaking. Def.'s Tab B, Shafer Depo. 201:16–205:11. According to Chief Shafer, Secret Service contacted SMU police and sought its assistance in dealing with Hux. *Id.* at 203:13–204:19. Chief Shafer attributes Secret Service's concerns to Hux's request to enter the private event and the allegedly suspicious black trench coat he was wearing. *Id.* at 201:21–24; 204:12–205:11.

    1.    The March 20, 2011 Incident

On the evening of March 20, 2011, Hux attended a meeting—held at the Service House—which was mandatory for students seeking to run for the SMU student senate. Def.'s Tab A, Hux Depo. 37:5–38:13. Howeth, who, as a Residential Community Director, resided at Service House at the time, heard Hux's voice at the meeting's conclusion and detected that he was making comments about her to other students. Def.'s Tab C, Howeth Depo. 71:8–72:23. Aware of Logan's letter to Hux informing him to "stay away from . . . Service House," Howeth contacted SMU police and informed the dispatcher that Hux was in a building that he was prohibited from frequenting, adding that his presence and loud comments made her feel uncomfortable and unsafe. *Id.* at 73:24–74:6; 80:1–4.

As a result, SMU Officers Porter, Stockford, Fowler, and McGuire reported to the Service House to address Howeth's concerns. Def.'s Tab L, Sanchez Decl., Ex. 1 – March 20, 2011 Police Reports, App. 195–98. Chief Shafer was at his home during this time, and thus was not involved in this incident. Def.'s Tab B, Shafer Depo. 107:5–13. When the officers arrived, they located Hux as he was leaving the Service House. Def.'s Tab L, Sanchez Decl., Ex. 1 – March 20, 2011 Police Reports, App. 195. Based on his identification, they determined that he had a concealed handgun

license and proceeded to pat him down for weapons, finding none. *Id.* at 195, 197. Meanwhile, Hux's cousin, Danielle Ferraro, arrived at the scene, driving Hux's car. *Id.* Fowler asked Hux whether he had weapons in his vehicle, to which Hux replied that he did not. *Id.* at 197. Fowler then asked Ferraro whether he could search the vehicle, and she consented. *Id.* at 195. At that time, Hux stated that it was his car and that it could not be searched, and Ferraro similarly asked the officers not to search the car. Pl.'s Ex. F, Ferraro Depo. 22:21–23:21. Fowler nevertheless proceeded to open the driver's side front door of the vehicle and observed the handle of a handgun protruding from under the driver's seat. Def.'s Tab L, Sanchez Decl., Ex. 1 – March 20, 2011 Police Reports, App. 197. As a result, Fowler instructed Porter to detain Hux for the safety of all involved. *Id.* at 195, 197. Hux was handcuffed, and the officers located his concealed handgun license in his wallet. *Id.* at 195. The officers placed Hux in their patrol vehicle as they investigated further. *Id.* Subsequently, the officers concluded that Hux did not have a protective order against him but had been advised by campus officials to stay away from Howeth and SMU Service House. *Id.* After unloading the weapon, the officers returned the unloaded handgun and its ammunition, separately, to Hux, and released him. *Id.* at App. 197–98.

### 2.    The March 21, 2011 Incident

The following morning, SMU officials determined that it was necessary for Hux to be issued a mandatory administrative withdrawal due to the escalating threat he was perceived to pose to the campus community. Def.'s Tab I, Hogan Decl., Ex. 1 – Withdrawal Letter, App. 134; Def.'s Tab G, Webb Depo. 85:9–86:3; 175:19–176:20. Later that day, SMU Officers Bernie Trujillo and Linda Perez, at the request of Chief Shafer, met Hux as he exited a class. Def.'s Tab L, Sanchez Decl., Ex. 2 – March 21, 2011 Police Report, App. 199; Doc. 70, Pl.'s App. in Support of Resp. to Mot. for

Summ. J., Ex. C, Webb Depo. 97:22–25; 98:15–22. The officers inquired whether Hux had a break after his class and, after Hux responded that he did, they informed him that Chief Shafer wanted to speak with him. Def.'s Tabs L, Sanchez Decl., Ex. 2 – March 21, 2011 Police Report, App. 199; N, Audio Recordings, 2nd Arrest Incident.m4a, 2:16–2:36. Hux specifically asked if the officers were going to "detain him," to which the officers retorted that they were not detaining him, later explaining that they were rather "giving [him] an escort." Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a at 2:59–3:03; 4:37–4:38. In light of the events of the previous evening, the officers asked Hux if they could search him and his bag for weapons, and Hux consented. *Id.* at 3:16–3:35. After the officers confirmed that Hux did not have weapons, they drove him to the SMU police station to meet with Chief Shafer. Def.'s Tab L, Sanchez Decl., Ex. 2 – March 21, 2011 Police Report, App. 199.

While waiting to meet with Chief Shafer, Hux complained to Trujillo and Perez about Howeth's behavior toward him, which he described as threatening and harassing. Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a, 5:21–5:24. When Trujillo and Perez asked Hux for details regarding his complaint against Howeth, Hux again inquired whether he was being detained and interrogated. *Id.* at 8:41–8:45. Trujillo responded that Hux was not being interrogated, but that they were merely listening to him because he had complained that someone had been harassing him. *Id.* at 8:45–8:54.

Shortly thereafter, Trujillo led Hux to Chief Shafer's office, where he met with Chief Shafer and Lisa Webb, Associate Vice President for Student Affairs and Dean of Student Life. *Id.* at 17:30; Def.'s Tab I, Hogan Decl., Ex. 1 – Withdrawal Letter, App. 134–36. Webb informed Hux that, in light of his escalating behavior, he would be placed on a mandatory administrative withdrawal, which

would require him to withdraw from the university but would allow him an opportunity to return in the spring of 2012. Def.'s Tabs N, Audio Recordings, 2nd Arrest Incident.m4a, 18:24–19:40; I, Hogan Decl., Ex. 1 – Withdrawal Letter, App. 134–36. In support of this decision, Webb cited Hux's inappropriate behavior toward Howeth, his presence at the Service House the prior evening, the loaded weapon found in his car, and his refusal to accept responsibility for his actions. Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a, 32:55–32:59. After Webb exited the office, Chief Shafer and Hux continued to discuss the events that culminated in the mandatory withdrawal. *Id.* at 33:45–44:19. Chief Shafer then notified Hux that, due to his mandatory withdrawal from SMU, he would no longer be permitted to remain on campus and would be issued a written criminal trespass warning—a measure that informed Hux that he would be subject to arrest if present on campus. *Id.* at 33:50–37:49. At the meeting's conclusion, Trujillo asked Hux if he would like a ride to his car, and Hux accepted Trujillo's offer. *Id.* at 4:43–4:49. Upon arrival at the location of his car, Hux voluntarily allowed Assistant Chief Walters to search it, and no weapon was discovered. *Id.* at 50:09–52:52.

> 3.   Publication of Article about Hux in SMU Student Newspaper

On March 25, 2011, the SMU student newspaper, *The Daily Campus*, published an article regarding Hux, titled "Student, R.A. expelled after deemed safety threat," which stated, in relevant part:

> "We don't want another Virginia Tech."
>
> That's what SMU Resident Life and Student Housing (RLSH) told junior Daniel Hux as they fired him from his resident assistant job, according to first-year Rhema McGee. McGee was a close friend of Hux and one of his residents.

Hux had questioned why there was a police officer in the meeting.[4] McGee said Hux went on to say the University thought he was going to shoot people.

*The Daily Campus* learned of the incident after the RLSH office distributed flyers at several dorms. The flyers featured a photo of Hux and a warning from the SMU police department that he was not allowed on campus.

SMU Police Chief Rick Shafer did not release the specific details of Hux's expulsion from campus. Shafer would only say that Hux was not a student at the university anymore and that he violated university policy.

Hux's actions "lead us to believe there are safety concerns," Shafer said.

. . .

Pl.'s Ex. T, SMU Daily Campus Article; Def.'s Tab A, Hux Depo., Ex. 5 – SMU Daily Campus Article, App. 24. The article then proceeds to relay the comments of individuals supporting Hux and criticizing the manner in which he was treated by the SMU administration. Def.'s Tab A, Hux Depo., Ex. 5 – SMU Daily Campus Article, App. 24.

B.    *Procedural Background*

Plaintiff filed his first complaint against Defendants SMU, Chief Richard Shafer, Steve Logan, and Lisa Webb on February 28, 2013. Doc. 1. After seeking leave of Court, Hux amended his complaint on July 15, 2013. Docs. 13, 13-1, 19. Following the Court's May 13, 2014 Memorandum Opinion and Order granting in part and denying in part Defendants' Motion to Dismiss, all but the following two claims against Chief Shafer were dismissed with prejudice: (1) a Section 1983 claim for illegal search and seizure; and (2) a Section 1983 claim for defamation. *See* doc. 32, May 13, 2014

---

[4] The article offers no context or explanation as to what meeting Hux was discussing.

Memorandum Opinion and Order ("May 13 Order") 41–42. On March 20, 2015, Chief Shafer filed the present Motion for Summary Judgment as to Hux's remaining claims. Doc. 62. Hux responded on April 27, 2015, and Chief Shafer replied on May 11, 2015. Docs. 68, 76. Accordingly, Chief Shafer's Motion for Summary Judgment is now ripe for the Court's review.

## II.

## LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that, as a matter of law, the movant is entitled to judgment. *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003). In a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the Court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371–72 (5th Cir. 2002).

When the party with the burden of proof is the movant, it must establish each element of its claim as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

- 10 -

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with some metaphysical doubt as to material facts, . . . by conclusory allegations, . . . by unsubstantiated assertions, or by only a scintilla of evidence." *Id.* (internal citations and quotations omitted). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)).

The district court does not have a duty to search the entire record to find evidence supporting the non-movant's opposition. *Jones v. Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). Rather, the non-movant must "identify specific evidence in the record, and [] articulate the 'precise manner' in which that evidence support[s] [her] claim." *Bookman v. Shubzda*, 945 F. Supp. 999, 1004 (N.D. Tex. 1996) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).

## III.

## ANALYSIS

Defendant Chief Shafer moves for summary judgment on Hux's Section 1983 claims, arguing that: (1) there is no evidence that he subjected Hux to a search or seizure during the March 20, 2011 and March 21, 2011 incidents; (2) there is no evidence that he made defamatory statements actionable under Section 1983 regarding Hux; and (3) he is shielded from liability on all claims due to his defense of qualified immunity. Doc. 63, Def.'s Br. in Support of Mot. for Summ. J. ("Def.'s Br.") 1–2. For the reasons that follow, the Court concludes that Chief Shafer has satisfied his burden in demonstrating the absence of a genuine issue of material fact as to Hux's Section 1983 claims.

Accordingly, the Court need not discuss the applicability of Chief Shafer's qualified immunity defense as to these claims.

A.      *Section 1983 Claim: Search and Seizure*

The Court first considers Hux's Section 1983 claim that Chief Shafer deprived him of his constitutional right to be free from illegal searches and seizures during the March 20, 2011 and March 21, 2011 incidents. Section 1983 affords redress for violations of federal statutes and constitutional norms. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). To prevail on a Section 1983 claim, a plaintiff must show (1) that he has been "deprived of a right 'secured by the Constitution and the laws' of the United States," and (2) that the deprivation was caused by a person or persons acting "under the color of" state law. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 241 (5th Cir. 1999) (quoting *Flagg Bros. v. Brooks*, 436 U.S. 149 (1978)).

Here, Hux claims that Chief Shafer violated his Fourth Amendment right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985); *see also Fernandez v. California*, 134 S. Ct. 1126, 1131–32 (2014); *Trent v. Wade*, 776 F.3d 368, 377 (5th Cir. 2015). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person, and the Fourth Amendment requires that the seizure be 'reasonable.'" *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (quoting *Terry v. Ohio*, 392 U.S. 1, 16 (1968)).

However, "[n]ot all encounters between law enforcement officers and citizens are seizures for purposes of the Fourth Amendment." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003) (citing *Terry*, 392 U.S. at 19). A consensual encounter between an individual and law enforcement

officers, without more, does not constitute a seizure, and "may be initiated by the police without any objective level of suspicion." *United States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995). The general rule is that a seizure has occurred "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also Terry*, 392 U.S. at 19 n.16; *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). Thus, the officers need not formally arrest an individual for a Fourth Amendment seizure to occur. *Rhodes v. Prince*, 360 F. App'x 555, 559 (5th Cir. 2010) (citing *Dunaway v. New York*, 442 U.S. 200, 212 (1979)).

The test to determine whether a plaintiff has been "seized" within the meaning of the Fourth Amendment is whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *Mask*, 330 F.3d at 336. To determine whether a reasonable person in the plaintiff's position would have believed he was free to leave, courts conduct a fact-intensive inquiry, examining the totality of the circumstances surrounding the alleged seizure. *Mendenhall*, 446 U.S. at 554; *Rhodes*, 360 F. App'x at 558. The inquiry into these circumstances is objective, "concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." *Mask*, 330 F.3d at 336 (citing *Michigan v. Chestnut*, 486 U.S. 567, 574, 576 n.7 (1988)). Circumstances indicating that a seizure has occurred have included "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554.

With these standards in mind, the Court examines the summary judgment record in the light most favorable to the plaintiff, Hux, to determine whether a question of fact exists as to his claim for illegal search and seizure on either March 20, 2011 or March 21, 2011.

1.      The March 20, 2011 Incident

The Court first turns to Hux's claim that his Fourth Amendment rights were violated during the March 20, 2011 incident outside the SMU Service House. Chief Shafer argues that he cannot be held liable for any alleged search or seizure on this date because he did not personally participate in the encounter and because there is no other basis for imposing supervisory liability on him. Def.'s Br. 17. As explained more fully below, the summary judgment submissions demonstrate that Chief Shafer took no part in this incident and therefore cannot be held liable for any alleged search or seizure on March 20, 2011.

"A supervisory official may be held liable under § 1983 only if (1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008) (citing *Baker v. Putnal*, 75 F.3d 190, 199 (5th Cir. 1996)); *see also Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987). "Supervisory liability even exists without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights,' and is 'the moving force of the constitutional violation.'" *Thompkins*, 828 F.2d at 304 (quoting *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985), *cert. denied*, 480 U.S. 916 (1987)) (internal quotation marks omitted). Furthermore, "[a] supervisor may also be liable for failure to supervise or train if: '(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure

- 14 -

to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference.'" *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (quoting *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009)).

In his briefing, Hux concedes that Chief Shafer was not present during the March 20, 2011 incident, but he nonetheless maintains that a genuine issue of material fact remains as to whether Chief Shafer was personally involved in or causally connected to the events that occurred on that date. Doc. 69, Pl.'s Br. in Support of Resp. to Mot. for Summ. J. ("Pl.'s Resp.") 15. Specifically, Hux argues that Chief Shafer is subject to supervisory liability because he instructed his subordinate officers to inform Mack and Howeth that they were to contact the SMU police department if they saw Hux at the Service House or at the other locations which Hux was advised not to go to. *Id.* at 15–16.

In support, Hux presents an excerpt of his own deposition in which he discusses the February 21, 2011 letter prohibiting him from going to several SMU buildings. Pl.'s Ex. AA, Hux Depo. 63:8–64:14. In this deposition excerpt, Hux avers that he received the letter from Chief Shafer and agrees that it indicated that he was to refrain from going to the Service House. *Id.* Then, in his briefing, Hux argues that Chief Shafer instructed Officer Strickland to inform Mack and Howeth that they were to contact SMU police in the event that Hux appeared at the Service House. *See* Pl.'s Resp. 16. This, in Hux's view, demonstrates that Chief Shafer was directly involved in the encounter between Hux and SMU police following Howeth's notification that she saw Hux at the Service House on March 20, 2011. *Id.* at 17. Regrettably, however, Hux does not support this assertion with evidence, as the passages of the depositions he references when attempting to draw the connection

between Chief Shafer and the March 20, 2011 incident have not been presented as part of the summary judgment record before the Court.[5]

However, even if the missing filings that Hux references in his briefing had been submitted, and even if they supported Hux's arguments as to Chief Shafer's connection to the March 20, 2011 incident, they would nevertheless be insufficient to allow a rational jury to conclude that Chief Shafer caused the constitutional injuries which Hux claims to have suffered. Even if, in February 2011, Chief Shafer had in fact ordered Officer Strickland to instruct Howeth to notify SMU police if Hux appeared at the Service House, such instructions would not form the necessary causal connection to, or affirmative participation in, the events of March 20, 2011. Thus, even accepting Hux's version of events on this issue, Chief Shafer's alleged instructions—given one month prior to the incident in question—merely informed his subordinates of the contents of the letter prohibiting

---

[5] While Hux's briefing cites to several deposition passages to demonstrate Chief Shafer's connection to the March 20, 2011 incident, Hux has not presented these deposition excerpts to the Court (and they are likewise absent from Chief Shafer's own filings). Specifically, the following arguments raised in Hux's briefing on this issue are unsupported by evidence in the record:

First, in his briefing, Hux claims that a segment of Chief Shafer's deposition shows that "[o]n February 24, 2011, Chief Shafer met with Officer Strickland and instructed Officer Strickland to meet with Dorthea [sic] Mack and Stephanie Howeth and to tell them to call or contact the SMU police department if they so little as saw Hux, even though there was no protective order or trespass warning concerning Hux's presence at the Service House or any other part of SMU's campus." Pl.'s Resp. 16 (citing Pl.'s Ex. A, Shafer Depo. 128:20–129:12; 175:19–176:21). Unfortunately, the excerpts of Chief Shafer's deposition specifically related to this assertion have not been made available to the Court. *See* Pl.'s Ex. A, Shafer Depo.

Next, Hux's briefing asserts that "[o]n March 20, 2011, Stephanie Howeth overheard [Hux] talking with another student in the common area of the Service House following a mandatory student meeting and, following the orders of Chief Shafer, Howeth called the SMU police department and alerted dispatch to [Hux]'s presence." Pl.'s Resp. 16 (citing Pl.'s Exs. D, Fowler Depo. 23:23–25:4, B, Howeth Depo. 151:2–152:5). Again, these specific portions of the depositions of Howeth and Officer Zachary Fowler have not been included in the record before the Court, and therefore cannot be considered. *See* Pl.'s Exs. D, Fowler Depo.; B, Howeth Depo.

Hux from frequenting the Service House; there is no indication that the instructions could qualify as "unconstitutional policies that causally result[ed] in the constitutional injury," as is required to support supervisory liability in such cases. *See Gates*, 537 F.3d at 435.

Lastly, Hux presents neither argument nor evidence that Chief Shafer failed to train or supervise the officers who participated in the March 20, 2011 incident, and he likewise makes no mention of a policy promoting an unconstitutional activity.

In sum, despite Hux's insistence that the March 20, 2011 incident was caused by Chief Shafer's instructions to his subordinates, the evidence does not reveal such a causal connection, nor does it indicate that Chief Shafer otherwise "affirmatively participated" in the encounter. To the contrary, the evidence submitted, viewed in the light most favorable to Hux, indicates that Chief Shafer was not present during the events of March 20, 2011, and that he in no way authorized or directed the officers to pursue their encounter with Hux in the manner that they did. Based on the lack of supervisory liability with respect to these alleged constitutional violations, the Court **GRANTS** Chief Shafer's Motion for Summary Judgment as to Hux's Section 1983 claim that an illegal search and seizure occurred during the March 20, 2011 incident.

    2.    <u>The March 21, 2011 Incident</u>

Next, the Court considers Hux's claim that, following the events of March 20, 2011, he was again subjected to an illegal seizure as he exited his class on March 21, 2011. Chief Shafer seeks summary judgment as to the March 21, 2011 incident, arguing that Hux was not seized within the meaning of the Fourth Amendment. Def.'s Br. 23. As previously stated, in evaluating whether Hux was seized, the Court must consider the totality of the circumstances surrounding this incident to determine whether a reasonable person in Hux's position would have believed he was free to leave.

*See Mendenhall*, 446 U.S. at 554. Circumstances indicating that a seizure has occurred include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person . . . , or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* The Court conducts this fact-intensive inquiry by examining the parties' summary judgment submissions, viewing them in the light most favorable to Hux. For the reasons that follow, the Court concludes that, based on the evidence presented, Hux was not seized during this incident.

In his briefing, Chief Shafer does not dispute that he played an integral part in the March 21, 2011 incident, but he maintains that this encounter did not constitute a seizure, as Hux voluntarily accompanied the officers to the SMU police station to meet with him. Doc. 76, Def.'s Reply 2–3; Def.'s Br. 25. Hux, in turn, insists that a genuine issue of material fact exists as to whether a seizure occurred, arguing that a reasonable college student in Hux's situation would not have felt free to leave when confronted by armed and uniformed officers. Pl.'s Resp. 20–21.

In an effort to demonstrate that the March 21, 2011 incident was not a seizure, Chief Shafer presents an audio recording of the encounter, recorded by Hux himself. Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a. This recording reveals significant details regarding the context of the encounter, the respective tones and attitudes of the SMU police officers and administrators involved, and the substance of the exchanges among the parties. In the recording, SMU Officers Trujillo and Perez are heard greeting Hux outside his classroom and identifying themselves in a pleasant and unthreatening tone and manner. *Id.* at 2:04–2:12. Hux and the officers are then heard exchanging polite inquiries regarding their respective days. *Id.* at 2:12–2:16. The officers then inform Hux that Chief Shafer would like to meet with him. *Id.* at 2:16–2:23. They are heard asking Hux if

he has a break before he has to report to any other class, to which Hux responds that he does. *Id.* at 2:29–2:36.

Hux is then heard inquiring whether they will be walking or driving to Chief Shafer's office. *Id.* at 2:57–2:58. The officers respond that they will be driving, which in turn prompts Hux to ask, "Y'all are not gonna detain me and put me in the back, are y'all?" *Id.* at 2:59–3:03. The officers state that he is not being detained and would not be handcuffed, which Hux is then heard acknowledging. *Id.* at 3:04–3:12. Absent from this exchange is any raising of the voice, authoritative speech, or intimidation; in fact, slight, relaxed laughter is heard from the parties. *Id.* at 3:05.

Apparently prior to entering the officers' vehicle, the recording reflects the following exchange, which can only be characterized as calm and free of any threat or intimidation:

> Officers: We're just gonna have a couple questions before you get in.
> Do you have any weapons on you?
>
> Hux: No ma'am.
>
> Officers: None. Do you mind if I look in your backpack?
>
> Hux: No.

*Id.* at 3:17–3:22. Based on this consent, the officers are heard stating, in an unthreatening manner, "We're just gonna do a quick . . . ," which is followed by noise suggesting a quick pat down. *Id.* at 3:30–3:35. A third officer is then heard asking Hux where his concealed handgun license is located, to which Hux does not give a definite answer, instead simply repeating that it is not with him. *Id.* at 3:38–3:40. After being prompted several more times, Hux clarifies that his license is at his house. *Id.* at 3:40–4:00.

The recording reveals that Hux's entrance into the officers' vehicle is not marked by any sign of protest on his behalf or by coercion or show of authority on the part of the officers; one of the officers is simply heard stating "alrighty sir" in a relaxed manner as she closes his door. *Id.* at 4:20. Once in the vehicle, the officers are again heard reminding Hux, "We're just giving you an escort," to which Hux clearly responds, "I know." *Id.* at 4:37–4:39.

Hux is then heard expressing his discontent with the situation, asking, "So did y'all think I was gonna run or something?" *Id.* at 4:52–4:53. He then proceeds to state, "I feel like I need to make a complaint myself, because I feel I'm in fear of my safety as well." *Id.* at 5:21–5:24. The officers note that they are not there to hurt him, but are rather there to protect him as well as others on campus. *Id.* at 5:51–5:52. Hux is then heard clarifying, "I'm not in fear of y'all, I'm in fear of others," remarking that Howeth, among other SMU staff, had made direct and indirect threats against him. *Id.* at 5:56–6:25.

Upon arrival at the SMU police station, the officers are heard informing Hux that they would go to one of their offices and wait for Chief Shafer to become available. *Id.* at 7:10–7:17. One of the officers then calmly tells Hux she would be willing to hear Hux's complaints about Howeth. *Id.* at 7:30–7:34; 8:40–8:41. This statement prompts Hux to ask, "So am I being detained, is this an interrogation, an interview?" *Id.* at 8:43–8:45. The officers are heard responding, "No no no no. Nothing criminal. No criminal. I'm just going to listen to you because you said someone's been harassing you." *Id.* at 8:45–8:54.

After being made aware that they could proceed to Chief Shafer's office, the officers are heard guiding Hux through the hallways in a calm and unthreatening manner, stating at times, "This way, sir." *Id.* at 17:30–17:53. Though it is unclear from the recording who was present in Chief Shafer's

office, Hux is heard greeting and being greeted by Chief Shafer and Webb. *Id.* at 18:17. The recording does not reflect any intimidation in Hux's tone, as he is heard pleasantly responding to one individual, "Nice to meet you again." *Id.* at 18:20.

Webb is then heard informing Hux that, after reviewing his actions and behavior, the SMU administration has decided to issue him a mandatory administrative withdrawal from the university. *Id.* at 18:24–19:22. Webb clarifies that this measure is not punitive and will allow Hux to return to SMU in the spring of 2012. *Id.* at 19:23–19:37. Webb then gives Hux an opportunity to read the letter reflecting this administrative action and ask any questions he may have. *Id.* at 19:37–19:40. Next, she articulates the concerns the SMU administration has regarding Hux's behavior, and Hux indicates that he can understand SMU's perspective on the events. *Id.* at 32:55–32:59. Although Hux's tone unsurprisingly appears disappointed, he nonetheless politely thanks Webb, and the two end the discussion on seemingly civil terms. *Id.* at 33:03–33:45.

Following Webb's exit from Chief Shafer's office, Chief Shafer proceeds to have a relaxed conversation with Hux regarding his time at SMU. Chief Shafer is first heard notifying Hux that, due to his mandatory administrative withdrawal, he must be issued a criminal trespass warning, which advises him that he is no longer permitted on campus. *Id.* at 33:50–37:49. Chief Shafer then asks Hux if he has any questions, and, in what appears to be a concerned and sympathetic manner, remarks, "I'm sorry it had to come to this,"explaining that many people were worried about his behavior. *Id.* at 37:49–38:31. Chief Shafer and Hux are then heard discussing Hux's repeated refusal to seek a mental health evaluation, which had been an ongoing issue throughout Hux's interactions with the SMU administration. *Id.* at 38:32–39:04. Next, Chief Shafer is heard calmly advising Hux

that he has the opportunity to return to SMU, obtain a degree, and pursue a successful career in the military or politics. *Id.* at 39:05–39:28.

Noting that he does not wish for Hux's future to be jeopardized, Chief Shafer turns to the incident at the Laura Bush lunch event and explains why Hux's actions made people feel uncomfortable. *Id.* at 39:28–41:50. Chief Shafer appears to assume that Hux harbored no ill intentions that day, and therefore focuses on clarifying why others can perceive certain behaviors as threatening under particular circumstances. *Id.* Chief Shafer then transitions to the events of the previous evening—March 20, 2011—and asks, "You add all these things up, you don't think the school would think something is wrong?" *Id.* at 41:50; 4:39–4:48. He proceeds to describe how Hux's actions, when viewed by university administrators seeking to protect the safety and comfort of students and staff, could prompt them to request that he withdraw for a period of time. *Id.* at 41:51–42:49. At the end of this discussion, Hux, in a somewhat resigned yet comfortable tone, is heard stating, "All right. I sure appreciate it. I mean I guess, I don't know what else to say." *Id.* at 44:08–44:12. Chief Shafer retorts, "I'm sorry it's come to this, Daniel, I really am. I'm very disappointed." *Id.* at 44:15–44:19.

At the meeting's conclusion, an officer is heard asking Hux if he would like a ride to his vehicle, to which Hux responds, "Sure, I would appreciate it. That way nobody gets any crazy ideas." *Id.* at 44:43–44:49. Based on this voluntary acceptance, the officers proceed to take Hux to his vehicle. *Id.* at 44:50. Prior to leaving, an officer is heard asking Hux if his weapon is in his car, and Hux responds that it is not, adding, "I can let you search it." *Id.* at 46:06–46:17. Accordingly, after arriving at Hux's vehicle, Hux again gives permission to Assistant Chief Walters to search his vehicle, who proceeds to search it without discovering any weapons. *Id.* at 50:09–52:52.

Nowhere does this recording indicate that the officers restrained Hux or exercised their authority in a threatening, compelling, or even condescending manner. The initial conversation between Hux and the officers waiting outside his classroom was calm and marked by polite exchanges. Absent from the encounter is any loud, forceful, authoritative, or accusatory speech. The officers' inquiry as to whether Hux had a break after his class further emphasizes their acknowledgment of Hux's freedom to leave. All of these contextual details and circumstances are further reinforced by the officers' express statement that Hux was not being detained and interrogated; Hux twice inquired whether he was being detained and interrogated, and the officers twice emphatically explained that he was not.

The recording thus reveals that the entire encounter of March 21, 2011 was aimed at discussing the circumstances surrounding Hux's administrative withdrawal. Any additional comments from Chief Shafer or other officers appear intended to provide guidance and to ensure that Hux understood why the SMU administration found it necessary to seek his withdrawal from the university. At no point during the encounter did any officer accuse Hux of engaging in criminal activity or seek information from him. While Chief Shafer inquired as to Hux's behavior at the Laura Bush lunch event, this discussion focused on showing Hux that his actions—even if devoid of ill intent—can make others feel uncomfortable. The words of regret and sympathy Chief Shafer expressed near the end of the encounter suggest that, although he appreciates the need for Hux to withdraw and reconsider his approach to interacting with SMU staff, he nevertheless understands the complexity of Hux's circumstances and believes in his ability to extricate himself from the unfavorable appearance that his actions have created.

In his response briefing, Hux presents a description of this incident—derived from his deposition testimony—that mirrors the audio recording in several respects, but contradicts it in others. Pl.'s Resp. 19–22. Although Hux's deposition testimony details a similar timeline of events and reveals that Hux was never told that he was under arrest, Pl.'s Ex. AA, Hux Depo. 82:17–19, his version of events differs from the statements heard in the audio recording in three significant ways. Specifically, Hux asserts, in his deposition, that: (1) the officers informed him he could not leave; (2) the officers did not ask for his consent prior to searching him; and (3) the officers interrogated him at the SMU police station. These differences are reflected in the following segments of Hux's deposition, which find no support in the audio recording of the encounter detailed above:

- During the initial encounter with the officers, Hux asked if the meeting could wait and if he could leave. The officers responded that the meeting could not wait and that he could not leave, and proceeded to walk him down the hall. Pl.'s Ex. AA, Hux Depo. 75:12–15; 83:4–15.[6]

- Once outside the building, the officers did not ask for Hux's consent prior to searching him. Pl.'s Ex. AA, Hux Depo. 80:18–81:3.

---

[6] The deposition excerpt most relevant to this matter proceeds as follows:

Q: Did you ask if you could leave?

Hux: I don't recall. I know for sure after getting out of class the two officers that were continuously with me through this whole ordeal, I asked them to start with if I could leave. And they said no.

Q: Did you ever try to leave?

Hux: No. I didn't want to be tackled and beaten.

Pl.'s Ex. AA, Hux Depo. 83:4–15.

- At the SMU police station, the officers interrogated him, then escorted him into Chief Shafer's office. Pl.'s Ex. AA, Hux Depo. 76:2–12.

In addition, Hux's deposition includes the following additional statements, which cannot be compared with the audio recording of the event:

- At the beginning of the encounter, the officers touched Hux on the arm. Pl.'s Ex. AA, Hux Depo. 78:3–6.

- Hux did not believe he was free to leave. Pl.'s Ex. AA, Hux Depo. 75:16; 82:19–21.

In reply, Chief Shafer notes the discrepancy between the audio recording—which Hux himself recorded, and which contains the entire length of the incident—and the statements derived from Hux's deposition. Def.'s Reply 7–8. He thus observes that when a party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Def.'s Br. 15–16 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court agrees.

After carefully reviewing the summary judgment record in the light most favorable to Hux, and after considering the totality of the circumstances—as established primarily by the audio recording as well as by the accompanying deposition testimony—the Court concludes that Chief Shafer has carried his burden in demonstrating the absence of a genuine dispute of material fact as to whether Hux's Fourth Amendment rights were violated.

Hux is unable to insist on a version of events that is contradicted by his own audio recording of the encounter. When a party's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (declining to adopt a version of

events that contradicts video recordings in the record); *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011). Although Hux seeks to depict the March 21, 2011 incident as one filled with commands, restraints, non-consensual searches, and interrogations, his audio recordings—which cover the entire length of the encounter—indicate no such circumstances and further highlight his consent to being searched as well as his understanding of the officers' assurance that he is being neither interrogated nor detained.

In addition, the Court reiterates that its inquiry into whether a reasonable person in Hux's situation would have felt free to leave is objective, "concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." *Mask*, 330 F.3d at 336 (citing *Chestnut*, 486 U.S. at 574, 576 n.7). Thus, Hux's insistence that he believed he could not leave or that he felt detained is irrelevant to the determination of whether a seizure occurred. Highly relevant, however, are the circumstances of the encounter and the tone, language, and statements of the officers—drawn from the audio recordings—which can be summarized and analyzed as follows.

First, the officers approached Hux after his class and drove him to the SMU police station, but they made clear that they were merely escorting him to a meeting with Chief Shafer. Their inquiry as to whether Hux had a break following his class would have made any reasonable person in Hux's situation understand that the officers were not compelling or restraining him. Hux was neither handcuffed nor given any instruction as to where to go or how to proceed, further signaling the lack of coercion during the incident.

Second, Hux inquired whether he was being detained and interrogated and was twice clearly and emphatically told that he was not. The issues discussed during this encounter further support

the officers' insistence that this was neither a detention nor an interrogation; Hux was informed that he would have to withdraw from SMU, but he was not accused of a crime and was not asked to reveal information. Chief Shafer's inquiry into the incidents that culminated in Hux's withdrawal was a manner of *offering* Hux advice and insight into the university's actions rather than a means for *obtaining* information from him.

Third, with respect to the searches of Hux's person and vehicle, the officers on both occasions expressly requested Hux's permission and carried out the searches only after obtaining his consent. In addition, the officers voluntarily offered their reasons for seeking to conduct the searches: the presence of Hux's loaded weapon in his vehicle, found by officers during the events of the previous evening.

Fourth, the tone of the officers remained calm, relaxed, and unthreatening at all times, free of any sign of coercion, aggression, or assertion of authority. The only raising of voice that can be discerned in the audio recording occurs close to the initial encounter between the officers and Hux, when one of the officers was forced to repeatedly ask where Hux's concealed handgun license was located, as Hux evaded answering the question directly.

Finally, any indication of a show of authority is not, in light of the totality of the circumstances, sufficient to characterize this encounter as a seizure within the meaning of the Fourth Amendment. While the officers were armed and in uniform—a fact undisputed by Chief Shafer—the record in no way suggests that the officers displayed their weapons in a menacing way or otherwise used their appearance to intimidate Hux. Moreover, while Hux avers in his deposition that the officers touched him on the arm after he exited his classroom, he did not describe this touching as forceful or as a means of restraining him. *See* Pl.'s Ex. AA, Hux Depo. 78:3–6. Additionally, his

description of any touching prior to entering the officers' patrol vehicle must be considered in light of the fact that, as heard in the audio recording, the officers specifically asked for Hux's permission prior to searching him.

In sum, a reasonable person in Hux's situation—who was told that he was not detained or interrogated, was treated calmly and peacefully, and was subject to neither restraints nor accusations—would feel free to leave. *See United States v. Lockhart*, No. EP-13-CR-1832-5-PRM, 2014 WL 4403159, at *3 (W.D. Tex. June 10, 2014) (concluding that an individual was not seized, even though he asserted "he did not have a choice but to cooperate," because the officers took the individual to their Homeland Security Investigation office but did not use a commanding tone of voice, display their weapons, or use physical contact or other show of authority during the encounter).

Based on the foregoing, Chief Shafer has demonstrated that Hux was not seized on March 21, 2011, and Hux has failed to raise a genuine issue of material fact as to this matter. Accordingly, the Court concludes that no rational jury could find that Hux was seized on March 21, 2011 and thus **GRANTS** Chief Shafer's Motion for Summary Judgment on this claim.

B.     *Section 1983 Claim: Defamation*

Chief Shafer further seeks summary judgment on Hux's Section 1983 claim for constitutional defamation. Def.'s Br. 25. This claim is based on the allegation that Chief Shafer made the following defamatory statement regarding Hux: (1) Hux planned to shoot former First Lady Laura Bush; (2)

Hux was dangerous; (3) Hux violated the SMU Code of Conduct; (4) Hux harassed an SMU employee; and (5) Hux was a liar.[7]

Hux's constitutional defamation claim arises under the Due Process clause of the Constitution and is thus based on the notion that he has suffered stigma to his reputation, which has infringed upon his protected liberty interests. *See Paul v. Davis*, 424 U.S. 693, 709–12 (1976). "While 'infliction of a stigma on a person's reputation by a state official, without more, does not infringe upon a protected liberty interest,' a plaintiff may assert a constitutional violation by alleging a stigma 'plus an infringement of some other interest.'" *Tebo v. Tebo*, 550 F.3d 492, 503 (5th Cir. 2008) (quoting *Blackburn v. City of Marshall*, 42 F.3d 925, 936 (5th Cir. 1995)). Thus, to demonstrate such a "stigma-plus" theory of defamation, a plaintiff must establish (1) stigma consisting of "concrete, false factual assertions" and (2) infringement upon a protected liberty interest, which occurs when "the state '[seeks] to remove or significantly alter a life, liberty, or property interest recognized and protected by state law' or the federal constitution as incorporated against the states." *Id.* (quoting *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995)).

In addition, the Fifth Circuit has recognized that a "defamatory communication need not cause the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus requirement of *Paul*. Instead it is sufficient that the defamation occur in connection with, and be

---

[7] In his Amended Complaint, Hux alleges that Chief Shafer defamed him by making the following statements: (1) "Hux planned to shoot Laura Bush;" (2) "Hux was crazy;" (3) "Hux was dangerous;" (4) "Hux had violated the SMU Code of Conduct;" (5) "Hux had stalked an SMU employee;" (6) "Hux had harassed an SMU employee;" and (7) "Hux was a liar." Doc. 13-1, Am. Compl. 26–27. In its May 13, 2014 Order, this Court held that the statements that "Hux was crazy" and that "Hux had stalked an SMU employee" were barred by the applicable statute of limitations. May 13, 2014 Order 37–38. Accordingly, only the remaining five statements are presently at issue.

reasonably related to, the alteration of the right or interest." *Marrero v. City of Hialeah*, 625 F.2d 499, 519 (5th Cir. 1980).

Chief Shafer insists that Hux cannot demonstrate that the alleged statements deprived him of a liberty or property interest. Def.'s Br. 27. Chief Shafer further argues that: (1) he never stated that Hux planned to shoot Laura Bush; (2) his comments that Hux is a security concern and that he violated university policy are not actionable false assertions of fact; and (3) none of the remaining comments were publicized outside SMU. Def.'s Br. 28–36. The Court thus examines the evidence related to each alleged statement, in turn, below.

1.      Statement that "Hux planned to shoot former First Lady Laura Bush"

According to Hux, Chief Shafer defamed him by stating that he planned to shoot former First Lady Laura Bush. Am. Compl. 26. In his deposition testimony, Hux clarified that Chief Shafer made this comment at the meeting at the police station on March 21, 2011, during which Chief Shafer and Webb informed Hux that he was required to withdraw from the university. Def.'s Tab A, Hux Depo. 98:24–99:8. Seeking summary judgment on this issue, Chief Shafer presents the audio recording of the meeting in question (recorded by Hux himself) to demonstrate that he never made the factual assertion that Hux "planned to shoot Laura Bush," but rather attempted to explain to Hux that his behavior during the incident may have led others to feel apprehensive. Def.'s Br. 29; Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a, 39:48–41:50.[8]

---

[8] The relevant portion of the audio recording of this meeting proceeds as follows:

Chief Shafer: Why did you show up at the Laura Bush thing the other day in a trench coat, by the way? What the heck was that all about?

Hux: I didn't show up there, I had a class.

Chief Shafer: You didn't try to get in?

A review of the audio recording of the meeting between Chief Shafer and Hux, previously

---

Hux: No, I asked if I could. I mean, who wouldn't?

Chief Shafer: So you showed up there and tried to get in.

Hux: Well, I mean, you could manipulate it as that.

Chief Shafer: But do you think—what do you think folks would think? Here's a dude on a hot day, in a trench coat, and Laura Bush is in this meeting. What would people think? I mean, what would some people think? Do you think that's normal?

Hux: How was it in the morning? Did you look at the weather in the morning?

Chief Shafer: I don't know what it was like. But I'm just asking you—OK, you wear a coat, no big deal. But why were you so insistent to get into that thing? You weren't invited. It was an invite-only thing.

Hux: Yeah, I understand that.

Chief Shafer: Yea, so what was that all about? You don't understand how people put—add that up, add up the thing about going to Boston, you know, you add all these things up and you gotta say, "What's up with Daniel?"

Hux: I can understand how people manipulate things, I understand that.

Chief Shafer: I don't know that it's manipulation—you were there, you tried to get in—

Hux: I didn't try—

Chief Shafer: —you were wearing a trench coat.

Hux: I—I asked, I mean, I can understand if I tried--if I tried to walk in, I could understand that, but—

Chief Shafer: Well, you know, you were trying to say, "can you get me a ticket."

Hux: I asked if there was any extras, I mean—

Chief Shafer: Yea, sure.

Hux: I mean, you wouldn't? I mean who wouldn't want to listen to a speech? I mean, I like to expand my knowledge.

Chief Shafer: I mean, it's a private thing, it's invited guests only, no I wouldn't try to get in. And I sure as hell wouldn't go over there in a trench coat. You know the secret service is there and the police were there. Isn't it—doesn't it strike you as a little odd, I mean, a little bit odd? "Hey, why is this guy . . . ?" You know? No?

Hux: It can be striking as odd, yes sir. But as I said, if you look at the weather, in the morning—

Chief Shafer: OK, all right.

Def.'s Tab N, Audio Recordings, 2nd Arrest Incident.m4a, 39:48–41:50.

discussed in detail above, reveals that Chief Shafer did not state or even imply that Hux intended to hurt Laura Bush. In fact, Chief Shafer's comments suggest that he assumed Hux had no ill intentions toward the former First Lady, but that he only sought to explain how his behavior, demeanor, and the circumstances of the event may have prompted others' suspicion. Moreover, Hux's deposition testimony confirms Hux's inability to point to a stigmatizing, false assertion of fact; when asked to relay Chief Shafer's defamatory comments, Hux responded, " . . . something to the effect that, why were you wearing a trench coat trying to get into the Laura Bush thing on a hot day? It was really hot, and it just throws up red flags. I mean, this ain't exact. It's just what I recall." Def.'s Tab A, Hux Depo. 99:10–14.

Chief Shafer acknowledges that Hux may have subjectively perceived his statements as implying that he had ill intentions toward Laura Bush, but he correctly observes that Hux cannot base a defamation claim on such feelings and inferences. Def.'s Br. 30. Instead, Hux must present "concrete, false factual assertions" to support a claim for defamation. *See Tebo*, 550 F.3d at 503 (quoting *Thompson*, 70 F.3d at 392). Hux presents no argument or evidence indicating the existence of such assertions. Therefore, after reviewing the record in the light most favorable to Hux, the Court concludes that no reasonable jury could find that an actionable defamatory statement was made regarding Hux's intentions toward Laura Bush.

2.    Statement that "Hux was dangerous"

Next, Hux claims that Chief Shafer defamed him by stating he was "dangerous." Am. Compl. 26. To demonstrate that no such assertion of fact was made, Chief Shafer presents the article from the SMU student newspaper, *The Daily Campus*, published shortly after Hux's withdrawal from the university. Def.'s Tab A, Hux Depo., Ex. 5 – SMU Daily Campus Article, App. 24. This article,

according to Chief Shafer, is the only evidence relevant to this statement, and Hux neglects to point

to any other evidence reflecting any comments that he was "dangerous" or the like. Def.'s Br. 33;

Pl.'s Resp. 23–24. The article in question, dated March 25, 2011, quotes Chief Shafer as stating that

Hux's actions "lead us to believe there are security concerns." Def.'s Tab A, Hux Depo., Ex. 5 – SMU

Daily Campus Article, App. 24. Chief Shafer insists that such a statement is a mere opinion rather

than an actionable assertion of a false fact. Def.'s Br. 33.

As previously noted, a claim for constitutional defamation requires the showing of (1) stigma

consisting of "concrete, false factual assertions" and (2) infringement upon a protected liberty

interest. *Tebo*, 550 F.3d at 503 (quoting *Thompson*, 70 F.3d at 392). Thus, mere opinions, containing

no false factual assertions, are insufficient to support a claim for defamation. *See Connelly v.*

*Comptroller of the Currency*, 876 F.2d 1209, 1215 (5th Cir. 1989) (concluding that "there has been

no false stigmatizing communication of the type that is constitutionally actionable," as the statement

at issue was an opinion, "contain[ing] no false factual representations, concrete or otherwise.").

The evidence presented, when viewed in the light most favorable to Hux, demonstrates that

Chief Shafer's statement expressed an opinion and was not an assertion of fact regarding Hux.

Moreover, as Chief Shafer explains, such a statement cannot be proven false, as Hux was indeed

perceived to be a security concern, which in turn prompted his withdrawal from the university. *See*

Def.'s Tab B, Shafer Depo. 220:6–23 (indicating that Chief Shafer believed the article's quote to be

consistent with his deposition testimony). Because Chief Shafer offers sufficient evidence to establish

that he did not make a false factual assertion that Hux was "dangerous," and because Hux has

neglected to submit any evidence raising an issue of material fact on this matter, the Court concludes

that no reasonable jury could find this comment to constitute actionable defamation.

3.      Statement that "Hux violated the SMU Code of Conduct"

Hux further claims that Chief Shafer defamed him by stating he "violated the SMU Code of Conduct." Am. Compl. 26. The parties dispute several facts related to this statement. However, the Court need not elucidate these facts or draw conclusions as to how they support Hux's defamation claim, as this matter can be resolved by considering whether this statement—even if truly asserted, and even if false—deprived Hux of a liberty or property interest, or was made in connection with such deprivation. After careful consideration of the record before the Court, viewed in the light most favorable to Hux, the Court concludes that any comment regarding Hux's violation of university policy is insufficient to support a claim for defamation.

The parties agree that the statement regarding Hux's violation of the SMU Code of Conduct refers to the presence of Hux's weapon in his vehicle, found by SMU police officers during the events of March 20, 2011. Pl.'s Resp. 12; Def.'s Br. 34; Def.'s Tabs A, Hux Depo. 97:24–98:2; B, Shafer Depo. 226:18–227:9.[9] In his deposition, Hux speculates that Chief Shafer made this statement during the meeting of March 21, 2011, when Hux was informed that he would be forced to withdraw from SMU. *See* Def.'s Tab A, Hux Depo. 97:21–22. Chief Shafer, in turn, points to *The Daily Campus* article, published shortly after this meeting, which states the following: "SMU Police Chief Rick Shafer did not release the specific details of Hux's expulsion from campus. Shafer would only say that Hux was not a student at the university anymore and that he violated university policy." Def.'s Tab A, Hux Depo., Ex. 5 – SMU Daily Campus Article, App. 24.

---

[9] When asked about his claim that Chief Shafer defamed him by stating that he violated SMU policy, Hux clarified, in his deposition, that Chief Shafer stated "something to the effect that, I believe, I violated the student—the university code or student code, or something like that, because I brought a weapon on campus, I believe is what he said." Def.'s Tab A, Hux Depo. 97:24–98:2.

Seeking summary judgment on this claim, Chief Shafer maintains that Hux cannot demonstrate that the statement that Hux "violated university policy" is false, noting that Hux did indeed violate the SMU Code of Conduct by bringing a weapon to the SMU campus on March 20, 2011. Def.'s Br. 34 (citing the SMU 2010-2011 Student Handbook § 3.30, which prohibits the use or possession of dangerous weapons and states that such weapons are not permitted on campus, *see* Def.'s Tab I, Hogan Decl., Ex. 2 – 2010-2011 Student Handbook, App. 145). Hux challenges this assertion on two grounds. First, he asserts that the weapon was not found on SMU campus, but rather on a street near, but not within, university grounds. Pl.'s Resp. 12 (citing Def.'s Tab B, Shafer Depo. 112:17–22).[10] Second, he observes that the SMU Student Handbook, which contains the provision prohibiting weapons on campus, also ensures that "[s]tudents accused of violating institutional regulations" retain certain rights. *Id.*; Def.'s Tab I, Hogan Decl., Ex. 2 – 2010-2011 Student Handbook, App. 139. One of these rights provides that "[e]very student shall be granted a fair hearing before an impartial board, or an administrative official." *Id.* Based on these policies, and because he did not receive a hearing following the discovery of the weapon in his car, Hux maintains that he could have been, at most, *accused* of violating SMU policy. Pl.'s Resp. 12. Thus, Hux argues that the statement that he "violated university policy" is false, as he was neither offered an

---

[10] Interestingly, Hux cites to Chief Shafer's deposition to show that his car was found on Dyer Street (which Hux claims is not on campus), rather than Dyer Court, as Shafer had insisted in his briefing. However, the excerpt to which Hux cites proceeds as follows:

Q. Okay. Do you know where the car was parked?

Chief Shafer: I don't know.

Q: You don't know if it was a public or a private road?

Chief Shafer: Well, if it was parked in front of the address 3041 Dyer Street, that's our road.

Def.'s Tab B, Shafer Depo. 112:17–22. Thus, in his deposition, Chief Shafer indicates that the vehicle was, in fact, on campus.

opportunity to contest these allegations, nor was it ever determined that he violated an SMU policy. *Id.* Moreover, Hux submits an excerpt from Webb's deposition, in which she conceded that no official determination was made as to whether Hux had violated the prohibition against bringing weapons on campus. Pl.'s Resp. 3; Pl.'s Ex. C, Webb Depo. 80:13–25. Webb further explained that, although Hux's actions constituted a "potential violation," she had never personally come to the conclusion that Hux violated a university policy, and he had never been referred to a conduct board for inappropriate behavior. *Id.* at 58:12–25; 81:2–25.

After careful review of the evidence presented, the Court concludes that a genuine issue of material fact exists as to whether the statement in question is false. Not only is there disagreement regarding whether Hux's weapon was present on campus on the evening of March 20, 2011, but the procedural safeguards listed in the SMU Student Handbook, combined with the testimony of Webb, make it unclear whether Hux in fact violated SMU policy on that date. Accordingly, the Court turns to Chief Shafer's remaining argument that the statement, even if false, cannot support a defamation claim, as it does not deprive him of a liberty or property interest. Def.'s Br. 27–28. Hux, in turn, does not address this contention, but rather argues that a showing of such deprivation is unnecessary, as Chief Shafer made these statements in connection with his denial of Hux's Fourth Amendment rights. Pl.'s Resp. 23–24.

Indeed, defamatory comments are actionable under Section 1983 if they "occur in connection with, and [are] reasonably related to, the alteration of the right or interest." *Marrero*, 625 F.2d at 519. However, in this case, Hux does not attempt to establish the connection between the statement that he "violated university policy" and the alleged denial of his Fourth Amendment rights, nor is it possible to glean such a connection from the record. The statement is vague and unsupported by

context that could allow the public to draw a connection between the alleged search or seizure of Hux and the statement that he "violated university policy." In fact, the article makes no mention of a search, seizure, or any other encounter between Hux and SMU police; it only notes that "Hux had questioned why there was a police officer in the meeting" without clarifying what meeting was at issue or describing what the police officer's purpose was at this meeting. Pl.'s Ex. T, SMU Daily Campus Article, App. 204. The article further reports that, according to an individual acquainted with Hux, Hux stated that "the University thought he was going to shoot people." *Id.* This statement indirectly conveys Hux's own statements and bears no connection to an alleged Fourth Amendment violation. Therefore, even if Hux had suffered an unlawful search or seizure on March 20, 2011 (pursuant to which his weapon was found), the article in question does not reference this incident or any possession of a weapon on campus. Moreover, the article conflates Hux's termination from his CA position with SMU's decision to place him on mandatory withdrawal and offers no context as to when or how Hux could have violated university policy. Thus, no reasonable jury could find that the public could perceive the statement that "Hux violated university policy" to be connected to the alleged Fourth Amendment violation of March 20, 2011. Accordingly, this statement cannot support a claim for defamation.

> ### 4.   Statements that "Hux harassed an SMU employee" and that "Hux was a liar"

Lastly, Hux asserts that Chief Shafer made the defamatory statements that "Hux harassed an SMU employee" and that "Hux was a liar." Am. Compl. 27. Chief Shafer, in turn, insists that the record contains no evidence that he made these statements. Def.'s Br. 36. Alternatively, even if he had made these statements, Chief Shafer maintains that they are not stigmatizing defamatory comments, as they would only have been made to SMU officers and administrators who met to

discuss Hux's behavior. *Id.* Hux does not point to any evidence supporting his claim that Chief Shafer stated that he harassed an SMU employee or that he was a liar, and the Court is unable to locate such statements in the record. *See* Pl.'s Resp. 23–24. Even Hux's own deposition does not appear to contain so much as an allegation that Chief Shafer made the comments in question. *See* Def.'s Tab A, Hux Depo. 93:18–107:23.[11] In light of the absence of any evidence supporting Hux's claim that Chief Shafer stated that he harassed an SMU employee and that he was a liar, and due to Hux's inability to come forward with evidence raising a genuine issue of material fact as to the existence of these statements, the Court concludes that no reasonable jury could find that Chief Shafer defamed Hux by making such assertions.

In conclusion, the Court notes Hux's belief that his reputation has suffered due to his withdrawal from SMU and due to the alleged statements made on his account. *See* Def.'s Tab A, Hux Depo. 108:5–112:25. However, in the single page Hux has devoted to briefing his defamation claim, he has made no attempt to address the evidence put forth by Chief Shafer. *See* Pl.'s Resp.

---

[11] A highly indicative segment of Hux's deposition proceeds as follows:

Q: I want you to list for me every false statement that Chief Shafer made about you that you're complaining about in this lawsuit.

Hux: He said that—at one of the meetings said that they, as in SMU, think I'm crazy. And then going on off that compared me to Virginia Tech, UT, Arizona, all these mass killings that were unfortunate, and compared me to that. An then said that in the paper that I had violated university policy, or something to that nature, made remarks that I was going to or trying to kill Laura Bush. That's what I recall right now. I know there are other things.

Def.'s Tab A, Hux Depo. 93:18–94:5.

Hux then elaborates on the allegedly defamatory comments he noted above, but makes no reference to any statement that he "had harassed an SMU employee" or "was a liar." *Id.* 94:12–107:23. In addition, no such references are found in Hux's submission of his deposition, as it does not even contain the portions relevant to the defamatory statement. *See generally,* Pl.'s Ex. AA, Hux Depo. Moreover, Hux fails to highlight any other evidence that could indicate Chief Shafer made the statements in question.

23–24. Moreover, this section of Hux's briefing references only one piece of evidence—an excerpt from his deposition—which relates to the scholarship he received at the academic institution he subsequently attended, and which is of dubious relevance to the defamatory statements at issue. *See id.* at 24 (citing Pl.'s Ex. AA, Hux Depo. 19:8–23). As this Court has no duty to search the entire record to find evidence supporting the non-movant's arguments, and as Hux has not raised a genuine issue of material fact on his defamation claim, Chief Shafer's Motion for Summary Judgment on Hux's defamation claim under Section 1983 is **GRANTED**. *See Jones*, 82 F.3d at 1334.

C.      *Qualified Immunity*

Based on the foregoing, the Court concludes that no reasonable jury could find that Hux was illegally searched, seized, or defamed, thus warranting summary judgment in favor of Chief Shafer on Hux's Section 1983 claims. Therefore, the Court need not discuss the applicability of Chief Shafer's qualified immunity defense as to these claims.

## IV.

## CONCLUSION

For the reasons stated above, Defendant Chief Shafer's Motion for Summary Judgment (doc. 62) is **GRANTED**.

Accordingly, Hux's remaining Section 1983 claims against Chief Shafer for unlawful search and seizure and defamation are **DISMISSED with prejudice**.

SO ORDERED.

SIGNED: June 11, 2015.


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE